# EXHIBIT 1

Location Code ___730254___

## SATELLITE FRANCHISE AGREEMENT

THIS AGREEMENT is made and entered into this __1__ day of __Sept.__, 19_84_ between H&R BLOCK

(__Albany__), INC., a __Albany__ corporation ("Block"), and

__Judy Strauss__
(Name)

__19 Chapel St.   Cobleskill, N.Y. 12043__
(Address)

("Franchisee").

In consideration of the covenants and agreements set forth below, Block and Franchisee agree as follows:

### 1. Definitions.

As used in this Agreement, the following terms shall have the meanings specified:

"Additional Services" means those services, other than Related Services, that Block has authorized Franchisee to perform under the Licensed Marks by the attachment of an addendum to this Agreement describing such Additional Services and the applicable terms and conditions, including payment of royalties.

"Arbitration Notice" means the written notice sent by either party to the other requesting arbitration of a dispute or Breach.

"Breach" means the happening of one or more of the grounds for termination of this Agreement set forth in paragraph 13.

"Controlled Entity" means a corporation or partnership in which Franchisee is the beneficial owner of a majority (over 50%) of each class of voting securities (if a corporation) or is the controlling general partner (if a partnership).

"Franchise Territory" means the City of __Cobleskill__, in the County of __schoharie__ and State of __N.Y.__.

"Gross Receipts" means all amounts received by Franchisee from the preparation of tax returns and performance of Related Services including, but not limited to, computer services in connection with the preparation of tax returns and performance of Related Services, and all amounts received from the performance of Additional Services if the addendum regarding any Additional Service does not specifically provide for the payment of royalties.

"Incapacitated" or "Incapacity" means the inability of Franchisee or a Principal, according to competent medical authority to perform the duties and obligations under this Agreement for a period of one year or more as the result of illness or accident.

"Licensed Marks" means the name and service mark "H&R BLOCK" and, with respect to operating an income tax return preparation service and performing Related Services, the service marks "THE INCOME TAX PEOPLE", "AMERICA'S LARGEST TAX SERVICE", "EXECUTIVE TAX SERVICE", "NATION'S LARGEST TAX SERVICE", and any other name or service mark that may be adopted by Block or registered by Block under appropriate service mark or trademark registration laws for use in such business and performing such services.

"Manual" means the H&R Block Policy and Procedure Manual, as amended by Block in its sole discretion from time to time.

"Off Season" means that portion of a calendar year other than the Tax Season.

"Principal" means an individual who is an executor or executrix, trustee, director or partner of a proposed transferee or a director or partner of a Controlled Entity and who personally assumes and agrees to be bound by all of the terms of this Agreement, in a document satisfactory to Block, to the end that Block may look to such individual, in addition to the proposed transferee or the Controlled Entity, for the proper performance of this Agreement.

"Related Services" means those products or services that Block has from time to time in writing authorized Franchisee to perform that deal with the preparation of income tax returns, such as, by way of illustration and not limitation, income tax return preparation schools and other similar products or services directly related to the business of preparing income tax returns.

"Renewal Terms" means those successive five-year terms after the initial term of this Agreement.

"Reporting Period" means those periods (1) commencing on the first day and sixteenth day of the months of January through March and on the first day of the months of May through December and ending, with respect to those periods commencing on January 1, February 1, and March 1, on the fifteenth day of each such month and, with respect to all other such periods, on the last day of each such month; and (2) commencing on April 1 and ending on the last day of the Tax Season and commencing the following day and ending on the last day of April.

"Tax Season" means the period from the first Monday after January 1 through the last date on which individual Federal income tax returns for the preceding year may be filed without an extension of time or incurring any penalty for late filing.

"Transfer" means any direct or indirect transfer (by gift or otherwise), assignment, lease or other dispostion of Franchisee's interest under this Agreement or of the majority stock ownership or controlling general partnership interest in a Controlled Entity (but does not include a disposition by will or operation of law on the death or incapacity of the franchisee who assigned this Agreement to a Controlled Entity) to any person, estate, trust, partnership or corporation.

### 2. Grant of Franchise.

Block grants to Franchisee, exclusively, the right to (i) operate an income tax return preparation service; (ii) perform Related Services; and (iii) after executing an addendum hereto, perform Additional Services under the Licensed Marks from a location or locations within the Franchise Territory.

Franchisee may conduct the activities permitted or required by this Agreement at such location(s) for any person or firm residing outside the Franchise Territory, or advertise or promote Franchisee's location(s) in media originating within the Franchise Territory and which may extend beyond the Franchise Territory. No Additional Services may be offered from any location unless an addendum authorizing the performance of Additional Services is attached hereto.

Franchisee shall have one year from the date Block first offers to authorize Franchisee to perform any service as an Additional Service to obtain the right to perform such service as an Additional Service under this Agreement by executing the applicable addendum for such Additional Service. If Franchisee does not execute the applicable addendum within such one-year period, then Franchisee shall have no right to perform such service and Block may, or may license third parties to, perform such service (as defined from time to time by Block) under the Licensed Marks from a location or locations within the Franchise Territory.

### 3. Manner of Use of Name.

Franchisee will operate his business of preparing tax returns and performing Related Services and any authorized Additional Services under the Licensed Marks. Franchisee acknowledges that the use of any other name or marks in conducting the business of this franchise is prohibited, that the Licensed Marks will be used only in connection with the business with which they are associated and in the manner specified by Block and that Franchisee shall not permit the Licensed Marks, or any substantially similar style or spelling thereof, to be used for any other purpose, including but not limited to, the formation of corporations, partnerships, business associations or any other form of business organizations, without the written permission of Block.

All uses of the Licensed Marks shall inure to the benefit of Block, and Franchisee shall not at any time acquire any rights in the Licensed Marks by virtue of any use thereof. Franchisee shall not at any time during the term of this Agreement or thereafter challenge or attack the validity of Block's rights in and to the Licensed Marks. Franchisee shall notify Block within 10 days of the time Franchisee becomes aware of any unauthorized use of the Licensed Marks.

### 4. Term of Agreement.

The initial term of this Agreement begins on the date hereof and ends five years after such date, unless sooner terminated by Block as provided in paragraph 13. Unless Franchisee is in default hereunder or under any agreement with or obligation to Block or any subsidiary or affiliate of Block, this Agreement shall be automatically renewed for successive Renewal Terms. Franchisee may terminate this Agreement effective at the end of the initial term or any Renewal Term, but only upon at least 120 days written notice to Block prior to the end of such term.

### 5. Initial Deposit.

As partial security for Franchisee's faithful performance of this Agreement, Franchisee deposits with Block the amount of $ **300.00** (which is, unless otherwise stated, determined as set forth below), the receipt of which is acknowledged by Block.

| If Franchise Territory Population is | Deposit is |
|---|---|
| Less than 15,000 | $   600 |
| 15,000 to 50,000 | 800 |
| Over 50,000 | 1,200 |

Population shall be determined as of the date of this Agreement from the most recent Standard Rate and Data Service or comparable figures. Such deposit shall be held by Block without interest, may be commingled with Block's other funds, may be applied by Block to the payment of all unpaid amounts owed to it by Franchisee and to the payment of all costs and expenses, including attorneys fees, incurred by Block in enforcing this Agreement, and shall be forfeited by Franchisee if Block terminates this Agreement pursuant to paragraph 13.

The parties expressly acknowledge that the forfeiture or application by Block of the deposit, or any portion thereof, shall not affect any other rights or remedies Block may have at law or in equity and that the forfeiture or application of such deposit shall not constitute liquidated damages or otherwise limit the damages or other legal or equitable remedies available to Block hereunder. To the extent not otherwise applied in accordance with this paragraph, the deposit shall be refunded to Franchisee two years after the termination, transfer or other disposition of this Agreement, provided (i) that the deposit shall be refunded within 90 days after the effective date of a transfer upon the death of Franchisee; and (ii) that upon a transfer to a Controlled Entity, the deposit shall be held by Block in accordance with this paragraph in satisfaction of the obligations of such Controlled Entity under this paragraph and Franchisee shall have no further interest in the deposit.

### 6. Royalties; Reports.

Franchisee shall pay Block royalties on Franchisee's Gross Receipts in each calendar year in the following amounts and at the times specified:

| On That Portion of Gross Receipts That Is | The Early Payment Royalty Rate Is | The Standard Royalty Rate is |
|---|---|---|
| $5,000 or less | 50% | 60% |
| Over $5,000 | 30% | 40% |

The standard royalty rate applies if neither the early payment royalty rate nor the 20% royalty rate described below is applicable. The early payment royalty rate applies if the royalty is paid to Block not later than five days after the end of the Reporting Period to which the royalty relates and no amounts payable to Block under this Agreement or otherwise are overdue. The royalty rate on the excess Gross Receipts for a calendar year over the average of the Gross Receipts for the two previous calendar years is 20% if paid to Block not later than five days after the end of the Reporting Period to which the royalty relates and is not subject to further reduction for early payment.

Royalties are due 30 days after the end of the Reporting Period to which they relate. Franchisee may defer until March 15 of each year the payment of 33 1/3%, if the standard royalty rate applies, or 40%, if the early payment royalty rate applies, of each royalty payment due on that portion of Gross Receipts that is $5,000 or less (up to an annual maximum deferred amount of $1,000). The entire deferred amount will be payable, without further discount for early payment, no later than March 15.

Within five days after the end of each Reporting Period, Franchisee shall submit to Block a copy of every customer receipt (in the form furnished by Block) and such other reports as may be required from time to time in the Manual.

### 7. Instruction and Other Assistance.

At its expense, Block will (a) advise and instruct Franchisee in the operational aspects of Franchisee's business; (b) advise in the selection and location of an office or offices; (c) furnish information necessary to establish an operating budget; (d) design forms which shall be used by Franchisee in Franchisee's business related to the preparation of tax returns and advise as to quantities needed; (e) initially train Franchisee in the preparation of tax returns (provided that such training shall take place at such times and at such places as Block shall designate) and thereafter make training material available to Franchisee; and (f) furnish all specialized forms (such as income tax forms and Block internal reporting forms) and designated equipment (which, subject to Block's then current practice, may include duplicating equipment and signs but not computer equipment, which is covered by paragraph 8) as specified in the Manual and deemed necessary from time to time by Block for Franchisee to efficiently operate hereunder, for Franchisee's use in his tax return preparation business. Any such designated equipment or specialized forms will be furnished without charge to Franchisee except that Franchisee will be responsible for freight charges (as determined by Block) on all items other than duplicating equipment and signs. All equipment shall be installed and (except for duplicating equipment) maintained in good working order by Franchisee. Block shall further supply, without charge, all such other items set forth as items available without charge (except for freight) to Franchisee in the Manual. At its expense, Block will furnish all promotion and advertising deemed advisable by it in its sole discretion, provided that Franchisee will bear the cost of any discount granted pursuant to any discount program promoted by Block in which Franchisee participates and that Block, in its sole discretion, may determine to pay Franchisee an amount determined by Block for certificates redeemed by Franchisee in connection with those programs specified by Block. Block has no obligation to provide any services, supplies or other items not specifically set forth in this Agreement.

### 8. Computer Equipment and Software.

Block may make available to Franchisee at no charge computer software (and any enhancements or revisions thereto) specifically designed for the computerized preparation of tax returns, at such time as Block in its sole discretion determines.

Such software shall remain the property of Block and shall be used only in accordance with the specific terms of the sublicense agreement which Franchisee will be required to execute to obtain such software. Block shall use its best efforts to continue to provide and maintain software for any computer equipment that Block has sold under this paragraph 8, provided that Block shall not have any obligation to continue to provide or maintain software for such equipment if such software is not available at a price acceptable to Block, nor to provide or maintain software for any particular type or brand of computer equipment that Block has not sold. Franchisee shall pay all other costs and expenses incurred in connection with the use of computers in Franchisee's business, including the acquisition of computer and computer-related equipment and supplies (other than forms for computerized preparation of tax returns that may be supplied by Block under paragraph 7). Block may from time to time offer for sale or lease to Franchisee computer and computer-related equipment selected by it to be compatible with the computer software then being provided. Block has no obligation to provide any services, supplies or other items relating to computers not specifically set forth in this Agreement.

### 9. Supplies.

Block may offer for sale to Franchisee certain office supplies, forms, machines, equipment and such other items as Block determines may be necessary and proper to conduct the Franchisee's business which are not covered in paragraphs 7 or 8 above. Block will furnish order forms and price schedules for such items and, if applicable the computer equipment provided in paragraph 8, but if certain items have not been priced by the date established by Block for Franchisee's placement of orders for any items Franchisee desires, then the price to be charged will be furnished Franchisee at least 10 days prior to shipment and if such price is not agreeable, Franchisee may cancel the order for that item within five days after receipt of notice of such price. Franchisee may purchase any items needed from any source without approval from Block provided the quality of any such item is at least equal to, and the general appearance of it is similar to, the comparable item being offered by Block in its catalog of supplies then in effect and in the hands of Franchisee. Block may charge interest at the maximum rate allowed by law on overdue accounts for items sold under paragraphs 8 or 9.

If all of Franchisee's obligations to Block are current, Block will extend credit to Franchisee up to the amount of the deposit provided in paragraph 5 for Franchisee's initial purchase from Block of supplies and forms not furnished by Block under paragraph 7 for each Tax Season. Payment for such supplies and forms will be due March 10 of the Tax Season for which such supplies were ordered. All other payments for supplies and forms, including all amounts in excess of the deposit, and all payments for machines, equipment and other items of a similar nature, are due within 10 days after the receipt of such supplies, forms, machines, equipment or other items or the date of an invoice for payment, whichever is earlier.

### 10. Franchisee's Conduct of Business.

Franchisee shall use his best efforts in operating the business of this franchise and shall provide client service in accordance with Block's high standards including, at a minimum: (a) preparing each tax return accurately in accordance with Federal, state and local laws and checking each return thoroughly; (b) maintaining sufficient office space or the number of offices and employing sufficient personnel with current tax return preparation training to accommodate all clients without undue delay and within any time commitments made to such clients; (c) resolving client complaints in a timely manner; (d) paying penalties and interest in accordance with any Block guarantee in effect from time to time and otherwise complying with the terms of such guarantee; (e) maintaining minimum office hours during the Tax Season, from 9 a.m. to 6 p.m. weekdays, 9 a.m. to 5 p.m. Saturdays and, subject to local laws and customs and at the option of Franchisee, 9 a.m. to 5 p.m. Sundays; and (f) maintaining minimum office hours during the Off Season as specified in the Manual and informing clients of the availability of Off Season service by providing information signs and a phone referral service or answering service or device. Franchisee shall manage and conduct the business in accordance with the rules and regulations specified as applicable to Franchisee in the Manual and, without limiting the generality of the foregoing, shall (a) maintain a neat and orderly office or offices during the Tax Season properly identified with appropriate signs and with adequate space for conducting the franchise business; (b) maintain separate bank accounts for Franchisee's tax return preparation business and for each Additional Service provided by Franchisee, if any; (c) pay all operational expenses including, without limitation, payroll, payroll taxes, rent, utilities and telephone charges, and freight, supply and other amounts due Block in a timely manner; and (d) maintain public liability insurance and errors and omission insurance in the amounts and with the coverage specified in the Manual. Franchisee may not conduct any business or activities from the office required to be maintained under this paragraph or allow any other person to conduct any activities from such office other than those permitted or required by this Agreement or the following activities or businesses being conducted on the date hereof: Bookkeeping, Notary Public., which shall not be conducted under the Licensed Marks and are not subject to royalties hereunder, provided that Franchisee may sublease such office during the Off Season to third parties for the purpose of conducting activities of the type that there will be no implication that such activities are being performed under the Licensed Marks, and provided that nothing herein shall prohibit Franchisee from leasing or subleasing separately identified office space not required in connection with Franchisee's business to third parties for the purpose of conducting any business or activities not required or permitted under this Agreement. Franchisee shall observe all Federal, state and local laws in his business and personal affairs, shall timely and properly file all business and personal tax returns and pay all taxes due, and shall notify Block of the institution of any legal action against Franchisee or Franchisee's property.

### 11. Books and Records.

Franchisee shall maintain for a period of at least three years full, complete and accurate books and records pertaining to tax return preparation, Related Services, any Additional Services and, for the purpose of determining compliance with the terms

of this Agreement, any other business of Franchisee, including, but not limited to, copies of all customer receipts, customer tax returns, bank statements; full, complete and accurate books and records of accounts prepared in accordance with generally accepted accounting principles; Franchisee's tax returns and any and all other reports, documents and records required to be filed with any governmental authority or maintained pursuant to any Federal, state or local law. All of such books and records shall be open to inspection by Block during Block's regular business hours.

### 12. Limitations on Competition and Disclosure.

(a) Franchisee covenants that: (i) during the term hereof he will not compete, directly or indirectly whether as an owner, stockholder, partner, officer, director or employee, with Block or Block franchisees in the business of preparing tax returns or performing Related Services in or within 45 miles of the Franchise Territory; in the franchise territory granted to any other Block franchisee; or within 45 miles of any office operated by Block; (ii) for a period of one year after the termination of this Agreement or the Transfer or other disposition of this franchise, he will not directly or indirectly, whether as an owner, stockholder, partner, officer, director or employee, solicit by mail, phone or in person, or divert from Block or Block franchisees any person for whom Franchisee prepared a tax return or performed Related Services or Additional Services at any time during the term of this Agreement for the purpose of rendering of services in connection with the preparation of tax returns or performance of Related Services or Additional Services; and (iii) for a period of one year after the termination of this Agreement or the transfer or other disposition of this franchise, he will not compete directly or indirectly, whether as an owner, stockholder, partner, officer, director or employee, with Block or Block franchisees in the business of preparing tax returns or performing Related Services or Additional Services in or within 45 miles of the Franchise Territory.

(b) Franchisee further covenants that Franchisee will never (i) divulge to or use for the benefit of any person, association or corporation outside of the H&R Block organization, any information or knowledge concerning customers, the methods, promotion, advertising or any other systems or methods of operation of Block's business or that of Block's franchisees which Franchisee may have acquired by virtue of his operations under this Agreement; (ii) use any materials regarding Additional Services without payment of the applicable royalty therefor and execution of an addendum regarding such Additional Services; or (iii) do any deliberate act prejudicial or injurious to the goodwill or name of Block. Information furnished to employees shall be reasonably limited to that which directly relates to such employee's duties and assists in the proper performance of such duties.

(c) If Franchisee violates the provisions of subparagraph (a) of this paragraph 12, Block shall be entitled to an accounting of revenues and payment of royalties pursuant to paragraph 6 or the applicable addendum regarding Additional Services with respect to those revenues, if any, derived by Franchisee from the preparation of tax returns or performance of Related Services or Additional Services in violation of such provisions, such payments to continue for one year or the remainder of the initial or any Renewal Term of this Agreement, whichever is longer. The parties expressly acknowledge and agree that such payment shall not affect any rights or remedies Block may have, at law or in equity (including the right to seek injunctive relief), against Franchisee by reason of the violation of this paragraph.

(d) Franchisee has carefully read and considered the provisions of subparagraphs (a) and (b) and, having done so, acknowledges that such restrictions, including but not limited to the time periods and geographical areas of such restrictions, are fair and reasonable and are reasonably required for the protection of the interests of Block, its franchisees and their respective clients. Franchisee further acknowledges that the qualifications for a franchise by Block are special, unique and extraordinary, and that this Agreement would not be entered into by Block except upon condition that the provisions of this paragraph 12 be included herein and that, as such, they be enforceable, in the event of a breach by Franchisee, by injunctive relief. Franchisee disclaims any defense to the enforcement of the provisions of this paragraph 12 founded on any claim by Franchisee against Block.

(e) If any provision of subparagraph (a) or (b) relating to time periods or geographical areas is found by a court of competent jurisdiction to exceed the maximum time period or geographical area such court deems reasonable and enforceable, the parties agree that such court may enforce such provisions for such time period and within such geographical area as the court finds to be reasonable. In addition, Block in its sole and absolute discretion may unilaterally reduce the scope of any provision of subparagraph (a) or (b) relating to time periods or geographical areas.

(f) If, notwithstanding the foregoing, any provision of subparagraph (a) or (b) is held to be invalid or unenforceable, such provisions shall be deemed to be separable and divisible from the remaining provisions, which shall continue to be valid and enforceable as though the invalid and unenforceable provision had not been included herein.

(g) Franchisee will cause each individual employed to prepare tax returns or to supervise the preparation of tax returns to execute an agreement, in the form prescribed by Block, containing substantially the same covenants against competition and disclosure as are set forth in subparagraphs (a) and (b)(i).

### 13. Termination of Agreement.

The following constitute grounds for termination of this Agreement by Block:  (a) any material and substantial breach of the terms hereof by Franchisee including, without limitation, (i) abandonment, (ii) improper use of the Block name, (iii) failure to

satisfy performance standards established by Block or specified in paragraph 10, (iv) nonpayment of franchise royalties, (v) competition in violation of paragraph 12, (vi) transfers or dispositions in violation of paragraph 16, (vii) failure to satisfy the requirements of paragraphs 17 or 18, (viii) knowingly maintaining false books and records or failure to maintain required books and records, or (ix) notification by Block of more than five alleged Breaches of any one or more provisions of this Agreement during any 12-month period, whether or not the same have been cured by Franchisee, or (b) other good cause including, without limitation, (i) fraud, (ii) Franchisee's failure to pay any Federal, state or local tax when due, (iii) Franchisee's conviction of, or admission of, a violation of any Federal, state or local statute relating to the conduct of Franchisee's business, (iv) Franchisee's conviction of any felony; or (v) Franchisee's bankruptcy or the appointment of a trustee for the benefit of creditors. Block shall give Franchisee notice of an alleged Breach and Franchisee shall have 15 days after such notice to cure the alleged Breach, provided that no notice or opportunity to cure is required if the Breach is one that cannot be cured including, without limitation, competition in violation of paragraph 12, notification of more than five alleged Breaches during 12 months, or conviction or admission of the specified violations of law. If Franchisee has not cured the alleged Breach within such 15 day period or if such Breach cannot be cured, Block may terminate this Agreement by giving Franchisee notice of such termination, provided that Franchisee shall have 15 days after such notice to request arbitration if such Breach is arbitrable under paragraph 15. Franchisee acknowledges that the grounds for termination set forth in this paragraph 13 constitute good cause for termination of this Agreement and that Block will be materially and substantially damaged as a result of any such Breach. All of the provisions of this paragraph 13, including the grounds for termination of this Agreement and the notice and cure periods set forth herein shall be subject to the provisions of any state law which is determined to be applicable to the termination of this Agreement and the specific provisions of any such state law shall apply in lieu of those specified in this paragraph but only to the extent required by any such state law.

### 14. Effect of Termination

If this Agreement is terminated, or upon its transfer or assignment as permitted herein, all rights of Franchisee shall terminate, and Franchisee shall immediately refrain from using, by advertising or otherwise, directly or indirectly any of the Licensed Marks. Without limiting the generality of the foregoing, upon any termination of this Agreement all amounts payable to Block or any of Block's subsidiaries or affiliates shall immediately become due and payable and Franchisee shall immediately return to Block all supplies and other items provided under paragraph 7, copies of all customer tax returns and all materials, data and property of Block, including all computer software provided under paragraph 8, all sets and copies of the Manual and all books, records, customer lists, customer names, forms, files and computer storage materials including such information and other relevant data, and shall assign whatever right, title or interest Franchisee may have in and to Franchisee's business telephone numbers and telephone and business directory listings, and all leases covering equipment or real property then used in connection with Franchisee's tax return preparation operations as Block may require (and upon Block's consent in writing to assume Franchisee's obligations, including payment of rental, thereunder). If Franchisee owns the real property then used in connection with Franchisee's tax return preparation or Additional Services operations, for a period of one year after termination of this Agreement, Franchisee shall not lease such premises to any person (other than Block or a transferee approved by Block pursuant to paragraph 16) for the purpose of conducting a tax return preparation business or business engaged in performing Additional Services. Block shall have the sole right and privilege to use any information appearing on file copies of customer tax returns in connection with the preparation of subsequent years' tax returns for such customers. Franchisee shall also refrain from using any words or combination of words similar or suggestive of any of the Licensed Marks, and any trade names, trademarks, slogans, designs, signs and emblems of Block, and shall further withdraw from use, and cease to use, all furniture, furnishings, advertising matter, stationery, forms or any other articles which display any of the Licensed Marks and trade names, other trademarks, service marks, slogans, designs, signs or emblems of Block. Franchisee will also upon any such termination, refrain from holding Franchisee out to the public in any way as affiliated or connected with Block, and thereafter distinguish Franchisee's business, if any, so clearly from that of Block as to avoid all possibility of any confusion by the public.

### 15. Arbitration.

Every effort shall be made to settle amicably any dispute between the parties arising out of or by reason of this Agreement, or the construction or performance hereof. Except as to nonpayment of franchise royalties, misuse of the Block name or conviction or admission of a tax-related offense, which are not arbitrable, these provisions relating to arbitration may be applied at the request of either Block or Franchisee to any alleged Breach of this Agreement and any other disputes that may arise from time to time, provided that (i) Franchisee may request arbitration only on his own behalf and not for or on behalf of any other franchisee, nor may any other franchisee request arbitration for or on behalf of Franchisee; and (ii) the arbitration of any dispute must commence within the applicable statute of limitations for the bringing of a suit on such dispute. If a mutual settlement or resolution of any such dispute or alleged Breach cannot be achieved within 30 days after the giving of the Arbitration Notice, the dispute or Breach must be submitted for arbitration.

The parties shall together appoint a single arbitrator within 15 days of the giving of the Arbitration Notice. If they are unable to agree on an arbitrator, then the American Arbitration Association, or any other organization mutually acceptable to the parties, shall be requested to appoint the arbitrator. The arbitration and award shall be in accordance with the rules and regulations then obtaining of the American Arbitration Association. Time is of the essence in these proceedings and a decision of the arbitrator shall in all events be rendered within 90 days after giving of the Arbitration Notice. Additional time for the decision may be granted by mutual consent of Block and Franchisee or upon request of the arbitrator, but in no case longer than 90 days after the last day

of the initial 90 days: If a decision is not rendered within the time set forth herein, the arbitration may be terminated by either party and either party may then proceed to have the matter resolved in a court of law. The arbitrator shall have no right to include or decide issues not directly involved in any dispute before him. The expense of arbitration shall be borne equally by Block and Franchisee. The decision of the arbitrator shall be legally binding. The location of any arbitration proceeding shall be determined by the arbitrator provided that such arbitration shall take place within the state in which the Franchise Territory is located.

### 16. Assignability.

Franchisee may not subfranchise, sublicense or Transfer and retain any interest (other than a bona fide security interest) in this Agreement. The prior written approval of Block shall be required for any Transfer, other than a Transfer to a Controlled Entity. Block will not arbitrarily or unreasonably exercise its right to approve or disapprove any proposed Transfer and any disapproval by Block with respect to a proposed Transfer shall be only for material and substantial reasons including, without limitation, a proposed Transfer in violation of any provision of this Agreement.

Approval by Block of a Transfer shall be subject to and conditioned upon the following: (i) receipt by Block of a Request to Transfer, which request shall include the name, address and principal occupation or business activity of the proposed transferee and such other information (including financial statements, business references and similar information) that Block reasonably requests for the purpose of approving or disapproving such Transfer; (ii) payment of all amounts due Block from Franchisee and the absence of any other default by Franchisee under this Agreement; and (iii) the execution by the transferee of the then current form of Block Satellite Franchise Agreement and payment of any required deposit. If the proposed transferee is an estate, trust, corporation or partnership then Franchisee shall also furnish to Block the name, address and principal occupation of each execu-tor or executrix, trustee, officer and director or each partner, as the case may be, of such estate, trust, corporation or partner-ship together with the name, address, principal occupation, and ownership interest of each significant stockholder (that is, a holder of 10% or more of any class of voting securities of such corporation) and the name and address of a Principal, and such other information (including financial statements, business references, and the like) that Block reasonably requests for the pur-pose of approving or disapproving such proposed transferee or Principal.

Block shall have 30 days from the date that all of the conditions set forth above have been satisfied and the Request for Transfer and all related documents have been received at Block's principal office in Kansas City, Missouri to approve or disap-prove such proposed transferee and, if applicable, the Principal thereof, provided that, without limiting Block's rights to approve or disapprove such proposed transferee or Principal, the proposed transferee or Principal must demonstrate to the satisfaction of Block that he meets all of the requirements for becoming a franchisee including, but not limited to, possessing good moral character, adequate financial resources, and the ability to operate the business of the franchise in accordance with Block's high standards. If Block approves the proposed transferee and Principal, the Transfer shall become effective upon the written ap-proval of Block. If Block disapproves the proposed transferee or Principal, it shall give Franchisee written notice setting forth the reason or reasons for such disapproval within the above 30-day period. In the event of such disapproval, Franchisee may re-quest arbitration or, one time only, submit an alternate Request for Transfer to Block within 30 days after the giving of notice of such disapproval, subject to all of the foregoing conditions with respect to the initial Request for Transfer.

An assignment of this Agreement to a Controlled Entity shall not be subject to the requirements on Transfer set forth above. However, Block shall be notified in writing at the time of such assignment of the name of the Controlled Entity, the effective date of such assignment and the name and address of each officer, director and significant shareholder(s) (as defined above), if a corporation, and of each general partner, if a partnership, and shall thereafter be notified in writing from time to time of any changes in the information required. In the event of an assignment of this Agreement to a Controlled Entity, Franchisee shall remain liable for the prompt and faithful performance of all terms, convenants and conditions of this Agreement until a Principal is appointed and approved by Block or until a Transfer occurs.

Franchisee's interest under this Agreement may be mortgaged or pledged without Block's approval, provided that no Transfer of Franchisee's interest on the foreclosure of such mortgage or pledge shall be effective until all of the requirements set forth in this paragraph 16 have been satisfied. No such mortgage or pledge shall limit Block's right to terminate this Agreement in accordance with its terms.

### 17. Change of Principals.

If Franchisee is a Controlled Entity for which no Principal has been appointed and approved by Block and the prior Franchi-see dies or is incapacitated, or if Franchisee is an entity that is required by paragraph 16 to have a Principal and such Principal dies or is incapacitated, then, in either case, Franchisee shall notify Block in writing within 60 days after the occurrence of such event of the name and address and such other information (including financial statements, business references and similar infor-mation) that Block reasonably requests regarding a new Principal. Block shall have 30 days after receipt of such notice to ap-prove such Principal (and may request further information), which approval will not be unreasonably withheld. Any disapproval by Block will be evidenced by a written notice setting forth the reason or reasons for such disapproval given within the above 30-day period. In the event of disapproval, Franchisee may propose the name of an alternative Principal within 30 days after notice of disapproval, subject to all of the foregoing conditions with respect to the initial notification of a proposed Principal or may request arbitration within such time period. If Block does not disapprove such Principal, such Principal shall execute the docu-ment required to become a Principal and shall promptly forward it to Block. If such Principal fails or refuses to promptly execute such document or if no Principal is approved by Block as provided, Block shall have the right to terminate this Agreement.

**18.  Death or Incapacity.**

If Franchisee is an individual and dies or is Incapacitated, Block shall be entitled to receive information from Franchisee or his legal representative as to what actions are being taken to prevent or minimize the interruption of the service required or to be rendered hereunder, and shall be entitled, but not required, to render whatever assistance is requested. Block shall be entitled to reimbursement from Franchisee or Franchisee's estate for any reasonable expenditures thus incurred if other than normal services provided in paragraph 7. Such death or Incapacity shall not of itself be grounds for termination of this Agreement. Within 180 days after such death or Incapacity, Franchisee or his legal representative shall commence action to assign this Agreement in accordance with paragraph 16. If such action is not commenced or such assignment is not completed within one year after such death or Incapacity (provided that any period of time during which an issue relative to a disapproval of any assignment is in arbitration shall not be included in determining whether such time limit has expired), Block shall have the right to terminate this Agreement.

**19.  Indemnification.**

During and after the term of this Agreement, Franchisee will indemnify and hold harmless Block from and against any and all loss, damage, liability, expense (including reasonable attorneys' fees) and cost of any kind or nature, not occasioned by the fault or neglect of Block, arising out of or in connection with the franchise granted by this Agreement or the breach of this Agreement by Franchisee.

**20.  Choice of Remedies.**

Block's remedies under this Agreement shall be cumulative and non-exclusive, and the choice of any remedy available at law or in equity shall not preclude Block from pursuing any other such remedy available to it.

**21.  Parties Not Joint Venturers.**

The parties hereto are not and shall not be construed as joint venturers, partners, agents or employees of each other, and neither party shall have any power to bind or obligate the other, and neither party shall be liable to any person whomsoever for any debts incurred by the other. The sole rights and obligations of the parties are as set forth in this Agreement.

**22.  Non-Waiver of Breach.**

The failure of either party hereto to enforce at any time or for any period of time any one or more of the terms or conditions of this Agreement shall not be deemed a waiver of such terms or conditions or of either party's rights thereafter to enforce each and every term and condition of this Agreement.

**23.  Cancellation of Prior Understandings; Amendments.**

This Agreement expresses fully the understanding by and between the parties hereto and all prior understandings, or commitments of any kind, oral or written, as to this franchise and any matter covered by this Agreement are hereby superseded and cancelled, with no further liabilities or obligations of the parties with respect thereto except as to any monies due and unpaid between the parties to this Agreement at the time of the execution of this Agreement. This Agreement may be amended only in a writing signed by both of the parties hereto.

**24.  Survival.**

The provisions of paragraphs 12, 14, 19 and such other provisions of this Agreement which by their terms extend beyond the term of this Agreement shall survive any termination of this Agreement in accordance with their terms.

**25.  Applicable Law; Partial Invalidity.**

The parties acknowledge and agree that this Agreement shall be subject to and construed by the laws of the State of Missouri unless any rule of law or public policy of the state in which the Franchise Territory is located requires that all or a specific provision hereof be governed by the laws of such state. If any convenant or other provision herein shall be determined to be invalid, illegal or incapable of being enforced by reason of any rule or law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect and no covenant or provision of this Agreement shall be deemed to be dependent upon any other unless so expressed herein.

**26.  Time of the Essence.**

As to all reports and fees payable to or to be made to Block, time shall be of the essence.

**27. Heirs, Successors and Assigns.**

Except as limited by paragraph 16 and related provisions herein, this instrument shall be binding upon and inure to the benefit of the respective successors, assigns, heirs, executors, administrators, and legal representatives, of the parties hereto.

**28. Notices.**

All notices required hereunder shall be in writing and shall be deemed sufficiently served by mailing, postage prepaid, via certified or registered mail, with respect to Franchisee, to the address shown below, and with respect to Block, to its principal office, 4410 Main Street, Kansas City, Missouri or to such other address(es) that may hereafter be designated by either party to the other, and shall except as otherwise provided herein be deemed to have been given as of the date so mailed.

**29. Binding Effect.**

This Agreement shall not be binding on either Block or Franchisee unless and until this Agreement has been executed by Franchisee and an executive officer of Block (that is, the President, Executive Vice President, or any Vice President of Block), and attested to by its Secretary or Assistant Secretary.

**In Witness Whereof,** the parties hereto have executed this Agreement the date first above written.

_(Franchisee)_

H&R Block (_Albany_), Inc.
**(Block)**

By _____   Vice President
(Name and Office)                Director
                                 Field Operations

_19 Chapel St_
(Address)

By _____
Assistant Secretary

_Cobleskill, NY 12043_
(City, State)

ADDENDUM TO S-8 CONTRACT


Bookkeeping being performed under the name of Judy M. Strauss


Re:   Article 10. Franchisee's Conduct of Business

_____
Judy M. Strauss, Franchisee

H & R Block_____
By _____
   Name & Office                    _____
                                     Address

By _____
   Asst Secty                        _____
                                     City, State

EXHIBIT D

## RECEIPT

The undersigned hereby acknowledges receipt of a copy of H & R Block, Inc.'s Uniform Franchise Offering Circular and Franchise Disclosure Statement dated June 26, 1984.

Dated this __13__ day of __July__ , 19_84_ .

x _Judy Merriness Strauss_

      *        *        *        *

## RECEIPT

The undersigned hereby acknowledges receipt of a copy of the Satellite Franchise Agreement with all blank spaces completed.

Dated this __13__ day of __July__ , 19 __84__ .

x _Judy Merriness Strauss_

      *        *        *        *

### FOR SATELLITE DIRECTOR'S USE ONLY

Date Satellite Franchise
Agreement and deposit received: _____

_Robert Foy_    10/23/84
Satellite Director

D-1

# H&R BLOCK

THE INCOME TAX PEOPLE

Corporate Headquarters • 4410 Main Street • Kansas City, Missouri 64111 • (816) 753-6900

DATE: 11/19/84

TO: REGIONAL DIRECTOR # 12

SUBJECT: CONTRACT TYPE S-8 (Con)

We are enclosing/holding the contract for _Cobleskill, NY / Hansville, NY_
to you for the reason(s) indicated by a check mark below. Please resubmit
direct to Corporate Headquarters, Attention: Field Operations, when these
items have been corrected, along with this copy of the error notice.

_____ Incorrect contract form used -- please use form _____ .

_____ Contract not signed.

_____ Xerox copies of contract not acceptable.

_____ Personal Qualifications Summary not attached.

_____ Personal Qualifications Summary not signed by satellite owner/
      regional director/satellite director.

_____ Financial statement (cash on hand) not completed in Personal Quali-
      fications Summary.

_____ Receipt page not attached.

_____ Incorrect dates used on Receipt page. (See RD Bulletin #26-80 & #30-80
      or refer to RD P&P pages 750.4 - 5-7-80)

_____ Form 2320S cancelling previous satellite owner not attached.

_____ Resignation/termination letter not attached.

_____ Form 2327 not attached.

_____ Form S-C1 cancelling old contract not attached.

_____ Special Addendum for Satellite Franchise Agreement not attached.

_____ Form 2320A (fact sheet) not attached.

_____ Office hours not listed on branch contract (S-6-1).

_____ Contract approval form (1090.30) not attached.

_____ Will not accept transfer of deposit -- resubmit with deposit check.

  X   Other _Bookkeeping names not specified_
      _in para. 10, pg. H._

Perb Fortner, Director
Satellite Franchise Operations

PBF:ckc                                        (satellite contract)
cc: Divisional Director